07 CV 5948

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STANLEY T. BOCK III, Individually and On Behalf of All Others Similarly Situated, <br><br>Plaintiff,<br><br>vs.<br><br>OPTIONABLE INC., KEVIN CASSIDY, MARK NORDLICHT, EDWARD J. O'CONNOR, ALBERT HELMIG, and MARC-ANDRE BOISSEAU,<br><br>Defendants. | Civil Action No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

JUN 2 2 2007

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Optionable Inc. ("Optionable" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a federal class action on behalf of purchasers of the publicly traded securities of Optionable between September 27, 2005 and May 14, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.  The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

3.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

4.  Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and the Company maintains substantial business operations in this District, as detailed herein.

5. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

6. Plaintiff Stanley T. Bock III, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Optionable at artificially inflated prices during the Class Period and has been damaged thereby, as detailed further herein.

7. Defendant Optionable provides services for the brokerage of energy derivatives to brokerage firms, financial institutions, energy traders, and hedge funds in the United States. The Company's headquarters are located at 465 Columbus Avenue, Suite 280, Valhalla, NY 10595.

8. (a) Defendant Kevin Cassidy ("Cassidy") was, at all relevant times, Vice Chairman, Chief Executive Officer ("CEO"), and a Director of Optionable.

(b) Defendant Mark Nordlicht ("Nordlicht") was, at all relevant times, Chairman of the Board and a Founder of Optionable.

(c) Defendant Edward J. O'Connor ("O'Connor") was, at all relevant times, President, Treasurer, and a Director of Optionable. Defendant O'Connor also was the Company's CEO prior to Defendant Cassidy.

(d) Defendant Albert Helmig ("Helmig") was, at all relevant times, a Director of Optionable. Defendant Helmig is the Company's Chairman.

(e) Defendant Marc-Andre Boisseau ("Boisseau") was, at all relevant times, Chief Financial Officer of Optionable.

(f) Defendants Cassidy, Nordlicht, O'Connor, Helmig, and Boisseau are collectively referred to herein as the "Individual Defendants."

2

9. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Optionable, were privy to confidential and proprietary information concerning Optionable, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Optionable, as discussed in detail below. Because of their positions with Optionable, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Optionable's business.

11. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual

3

Defendants were provided with copies of the Company's reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

12. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the over-the-counter bulletin board operated by the National Association of Securities Dealers, Inc. ("OTCBB") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Optionable's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Optionable's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Optionable's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Optionable's business, operations, and management and the intrinsic value of Optionable's securities; (ii) enabled Defendants Cassidy, O'Connor and Nordlicht to sell 10,758,886 shares of their personally-held Optionable stock for gross proceeds in excess of $28 million; and (iii) caused plaintiff and

4

members of the Class to purchase Optionable's publicly traded securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the publicly-traded securities of Optionable between September 27, 2005 and May 14, 2007, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which defendants have or had a controlling interest.

15.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Optionable's stock was actively traded on the OTCBB. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Optionable or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

17.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Optionable;

(c) whether the prices of Optionable's publicly traded securities were artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

19. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

20. Defendant Optionable describes itself as a "leading provider of natural gas and other energy derivatives trading and brokerage services, headquartered in Valhalla, NY. The Company provides its services to brokerage firms, financial institutions, energy traders, and hedge funds nationwide. In addition to the traditional voice brokerage business, Optionable developed an automated derivatives trading platform. OPEX is a real-time electronic trade

matching and brokerage system designed to improve liquidity and transparency in the energy derivatives market."

21.   On May 9, 2005, Optionable filed with the SEC a Form 424B3 Prospectus (the "Prospectus") for the IPO. On that date, the Company registered 30,131,026 shares, and 1,300,000 shares underlying outstanding common stock purchase warrants. All of the shares were offered by certain of the Company's stockholders and warrant holders, including the Individual Defendants. The shares were sold at $0.20 per share. With regard to its customer concentration, the Prospectus represented, in pertinent part, as follows:

> One of our customers, Bank of Montreal, accounted for approximately 10% of our revenues during 2004. Two of our customers, Bank of Montreal and Coral Energy Holding, L.P., accounted for approximately 17% and 10%, respectively, of our revenues during 2003.

22.   BMO Financial Group ("BMO"), also known as Bank of Montreal, increased its business with Optionable when prices in natural gas options rose following Hurricane Katrina in August 2005.

23.   Throughout the Company's history, Optionable understated its dependence on BMO. In its latest quarterly report, Optionable stated that BMO accounted for approximately 30% of its revenues during the three-month period ended March 31, 2007. Optionable is the so called "middle-man" in the energy trading options business. In other words, it matches buyers with sellers and makes money by charging a commission to both parties. Therefore, since BMO was on one side of the transaction, BMO actually accounted for approximately 60% of the Company's potential revenue. Moreover, the Company failed to tell investors that its business with BMO was tied intimately to David Lee ("Lee"), a natural gas trader at BMO. Unbeknownst to investors, Lee had a close personal relationship with executives at Optionable, including

Defendant Cassidy. According to reports, Lee's trading alone in the first quarter of 2007 amounted to $2.73 million, or 30% of Optionable's revenue.

24. On April 27, 2007, when BMO announced that its mark-to-market commodity trading losses were estimated to be between $350 million and $450 million (pre-tax) in the second quarter of 2007, shares of the Company's stock fell $1.45 per share, or almost 21%, to close at $5.56 per share after investors recognized that BMO accounted for at least 24% of the Company's revenues in 2006.

25. On May 8, 2007, when BMO announced that it was suspending all of its business relationships with Optionable pending the results of a full external review and placed Lee and Bob Moore, executive managing director of commodity products at BMO, on leaves of absence, the price of Optionable stock declined precipitously, falling from $4.64 per share to $2.81 per share - a decline of approximately 40% - on heavy trading volume. According to reports, BMO contributed its mark-to-market commodity trading losses to bad trading strategies employed by Lee. Moreover, BMO was concerned with the quality of valuations provided by Optionable to BMO and Lee being able to do all of his business through one broker.

26. Shares of the Company's stock continued to decline as investors learned that: (i) NYMEX Holdings, Inc. ("NYMEX") had resigned its board representation of Optionable; (ii) Defendant Cassidy had resigned; and (iii) Defendant Cassidy served time in prison for a felony conviction on credit card fraud in 1997 and for income tax evasion in 1993.

27. Prior to disclosing these adverse facts, Defendants Cassidy, O'Connor and Nordlicht were able to sell 10,758,886 shares of their personally-held Optionable stock to NYMEX for gross proceeds in excess of $28 million.

**Materially False and Misleading Statements Issued During the Class Period**

28.   The Class Period begins on September 27, 2005. On that date, the Company's stock began trading on the OTCBB and closed at $1.00 per share.

29.   Optionable's financial results for the third quarter of 2005, the period ended September 30, 2005, were reported in the Company's Report on Form 10-QSB filed with the SEC on or about November 7, 2005, which was signed by defendants Cassidy and Boisseau. With regard to BMO, the annual report stated:

> One of the Company's customers accounted for approximately 16% and 10% of its revenues during the nine-month periods ended September 30, 2005 and 2004, respectively.

30.   On March 15, 2006, Optionable issued a press release announcing its financial results for the year ended December 31, 2005. For the year, the Company reported revenues of $5,805,414, net income of $1,259,564, and diluted earnings per common share of $0.02 per share. Defendant Kevin Cassidy, commenting on the results, stated, in pertinent part, as follows:

> Our 2005 results reflect our ability to execute in a demanding market and the continuing growth of our brokerage services. While 2004 represented a turnaround year for the Company, in 2005 we were able to strongly grow our profitability while increasing our research and development investments for OPEX, our new electronic platform for trading energy derivatives.
>
> We had a strong start for 2006 building on the growing activity in the natural gas and energy markets and new financial institutions participating in the markets. Our daily average OTC trading volume hit a record level for the month in February 2006 and our access to blue chip clients enabled us to execute larger deals. Last month NYMEX certified OPEX to electronically clear trades through NYMEX ClearPort(R) and since then we have had a significant number of inquiries from industry players regarding OPEX and its potential for the natural gas derivatives market. OPEX is in its final stages of development and testing and we are finalizing certain enhancements to the platform. We believe that OPEX will become a marketplace of choice to trade natural gas and other energy derivatives.

31.   Optionable's financial results for the year ended December 31, 2005, were reported in the Company's Report on Form 10-KSB filed with the SEC on or about March 15,

9

2006, which was signed by defendants Nordlicht, Cassidy, O'Connor, Helmig, and Boisseau. With regard to BMO, the annual report stated:

> One of our clients, Bank of Montreal, accounted for 18% and 10% of our revenues during 2005 and 2004, respectively.

32.     Optionable's financial results for the first quarter of 2006, the period ended March 31, 2006, were reported in the Company's Report on Form 10-QSB filed with the SEC on or about May 5, 2006, which was signed by defendants Cassidy and Boisseau. With regard to BMO, the annual report stated:

> One of the Company's customers accounted for approximately 10% and 13%, respectively of its revenues during the three-month periods ended March 31, 2006 and 2005, respectively.

33.     On May 8, 2006, Optionable issued a press release announcing its financial results for the first quarter of 2006, the period ended March 31, 2006. For the quarter, the Company reported revenues of $2,233,996, net income of $824,909, and diluted earnings per common share of $0.02 per share. Defendant Kevin Cassidy, commenting on the results, stated, in pertinent part, as follows:

> Our record results for the quarter reflected the strong growth in the volume of options traded along with the growing demand for our brokerage services. Our ability to execute trades in a demanding market and provide access to the broadest group of counterparties provides customers with an advantage in the volatile energy market. Further we achieved our dramatic growth in profitability while also accelerating debt repayments and continuing our research and development investments for OPEX, our new electronic platform for trading energy derivatives.
>
> The much publicized geopolitical events in Iran, Nigeria, Venezuela and elsewhere, together with the strains imposed on domestic energy supply, continue to contribute to increased volatility in the energy market. We believe this will continue to drive increases in the volume of transactions in the energy derivatives market as a growing number of investors seek to realize the opportunities. The combination of our OTC brokerage services along with the introduction of OPEX provides our customers a broad range of opportunities to participate in the energy derivatives market.

Defendant Edward O'Connor added, in pertinent part, as follows:

> Our daily average volume of options brokered grew to 21,176 for the first quarter of 2006. This is in addition to a daily average volume of swaps and futures that amounted to 2,887 for the first quarter of 2006. This growth in volume speaks to our ability to find counterparties for a significant number of transactions, including the most complex ones, and demonstrates the growing demand in the energy derivatives market.

34.  On July 25, 2006, Optionable issued a press release announcing its financial results for the second quarter of 2006, the period ended June 30, 2006. For the quarter, the Company reported revenues of $2,476,664, net income of $668,547, and diluted earnings per common share of $0.01 per share. Defendant Cassidy, commenting on the results, stated, in pertinent part, as follows:

> We are pleased to be able to report continued strong year over year growth in the volume of options traded along with the growing demand for our brokerage services. We continued to see strong demand for natural gas contracts even as we moved out of the traditional peak demand during the winter heating months in the northeast. Our continued growth reflects our ability to execute trades in a demanding market and provide our customers with broad access to counterparties.
>
> The energy markets continue to be very active as investors look for opportunities and closely follow global events and the beginning of the hurricane season. We believe that these factors will continue to contribute to volume growth in the energy derivatives market and that Optionable is well positioned with the expertise needed to trade in these increasingly complex markets. At the beginning of the third quarter, OPEX our electronic trading platform was launched. We are confident that it will provide a strong market advantage tool for customers seeking visibility and new opportunities to trade natural gas contracts.

35.  Optionable's financial results for the second quarter of 2006, the period ended June 30, 2006, were reported in the Company's Report on Form 10-QSB filed with the SEC on or about July 25, 2006, which was signed by defendants Cassidy and Boisseau. With regard to BMO, the annual report stated:

11

One of the Company's customers accounted for approximately 22% and 15%, respectively of its revenues during the six-month periods ended June 30, 2006 and 2005, respectively.

36.     On October 25, 2006, Optionable issued a press release announcing its financial results for the third quarter of 2006, the period ended September 30, 2006. For the quarter, the Company reported revenues of $4.5 million, net income of $2.2 million, and diluted earnings per common share of $0.04 per share. Defendant Cassidy, commenting on the results, stated, in pertinent part, as follows:

> It is clear from the recent news headlines that there is increased interest in derivatives trading. And we feel that the best is yet to come for Optionable. Our record results for the third quarter have primarily been achieved through traditional means of service of delivery, voice-brokerage and open outcry. Our electronic platform, OPEX, which we recently introduced, will gain adherents in the energy commodities markets and, ultimately, with other commodities markets. The latest addition to our services offering, OPEX Analytics, enables us to offer a broader variety of solutions to satisfy our clients' needs. We certainly would not be where we are without providing consistent, timely, and outstanding quality services to our clients.

37.     Optionable's financial results for the third quarter of 2006, the period ended September 30, 2006, were reported in the Company's Report on Form10-QSB filed with the SEC on or about October 25, 2006, which was signed by defendants Cassidy and Boisseau. With regard to BMO, the annual report stated:

> One of the Company's customers accounted for approximately 22% and 15%, respectively of its revenues during the nine-month periods ended September 30, 2006 and 2005, respectively.

38.     On January 22, 2007, the Company issued a press release announcing that NYMEX agreed to acquire a 19% stake in Optionable from its three founding stockholders. NYMEX also acquired warrants which would permit it to increase its stake in the Company. Defendant Cassidy, commenting on the NYMEX acquisition, stated, in pertinent part, as follows:

12

This strategic relationship between Optionable and NYMEX, the world's largest exchange for the trading of energy futures and options contracts, will propel our growth in energy and other commodity markets. The combination of having NYMEX as a stakeholder in our success and the development of joint technology programs will enhance our high standing within the energy and other commodities derivatives community. The transaction was structured to allow NYMEX to be a stakeholder in Optionable without immediate dilution to existing shareholders, and to allow Optionable's existing management to retain a high percentage of ownership in the Company. We believe that this cooperation between both companies will be extremely favorable to our business, and consequently will be well-received by our existing and potential clients.

39.  On February 6, 2007, Optionable issued a press release announcing its financial results for the fourth quarter and year end of 2006, the period ended December 31, 2006. For the quarter, the Company reported revenues of $6.8 million, and net income of $2.5 million, or $0.05 per diluted share. Defendant Kevin Cassidy, commenting on the results, stated, in pertinent part, as follows:

> 2006 was a benchmark year for us, with the launch of our electronic trading platform, OPEX(R), as well as our Analytics service. We're particularly happy with these results as they are due almost entirely to our customers' positive response to the innovative and impeccable service we delivered to them. These results also demonstrate a very healthy and largely untapped market for our derivative brokerage services.
>
> The results for the quarter and the year were driven primarily by our voice-brokerage and open outcry service; however, OPEX, which we launched in July 2006, is beginning to add to our overall revenue mix. We expect that the efficiency of OPEX in executing trades, will cause its contribution to revenue to become a substantial portion of the mix as we progress into 2007 and even 2008, particularly as we begin to open up the market for our services.
>
> We intend to build on the success we've enjoyed to date, adding products and services beyond our capabilities in the energy derivative market and Analytics. We intend to look at expanding our relationship with NYMEX, and increase the traction of OPEX. In short, there are a number of strategic opportunities in front of us and we will examine each one thoroughly and carefully in order to continue building Optionable into a force in the derivatives brokerage business.

40. Optionable's financial results for the fourth quarter and year end of 2006, the period ended December 31, 2006, were reported in the Company's Report on Form 10-KSB filed with the SEC on or about March 23, 2007, which was signed by defendants Nordlicht, Cassidy, O'Connor, Helmig, and Boisseau. With regard to BMO, the annual report stated:

> One of our clients, Bank of Montreal, accounted for 24% and 18% of our revenues during 2006 and 2005, respectively.

41. On April 10, 2007, the Company issued a press release announcing that it had completed the transaction for NYMEX to purchase a 19% stake in Optionable. As part of the transaction, Defendants O'Connor, Cassidy, and Nordlicht sold 10,758,886 shares of common stock at $2.69 per share, thereby reaping nearly $29 million in gross proceeds. The chart below summarizes defendants' transactions:

| Defendant | Shares | Price | Proceeds |
|---|---|---|---|
| Kevin Cassidy | 1,905,000 | $2.69 | $5,124,450 |
| Edward J. O'Connor | 1,853,886 | $2.69 | $4,986,953 |
| Mark Nordlicht | 7,000,000 | $2.69 | $18,830,000 |
| Total: | 10,758,886 | | $28,941,403 |

42. The statements referenced above in ¶¶29-40 were each materially false and misleading because they misrepresented and failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a) that, contrary to previous representations, the Company was more dependent on BMO. Although the Company stated that approximately 30% of its revenues were derived from BMO, the Company's transactions with BMO represented more than 60% of its potential revenues;

(b)     that the Company's relationship with BMO was intimately tied to one broker, who had a personal relationship with Defendant Cassidy;

(c)     that the Company's CEO, Defendant Cassidy, was sentenced to 30 months for a felony conviction on credit card fraud in 1997 and six months for income tax evasion in 1993;

(d) as a result of the foregoing, the Company's ability to continue its operations was in serious doubt.

### The Truth Begins to Emerge

43.     On April 27, 2007, BMO Financial Group issued a press release announcing that mark-to-market commodity trading losses were estimated to be between $350 million and $450 million (pre-tax) in the second quarter of 2007. The press release continued, in pertinent part, as follows:

> A number of factors contributed to these mark-to-market commodity trading losses. During the quarter, positions held by BMO Financial Group in the energy market, primarily for natural gas, were negatively impacted by changes in market conditions. In particular, the market became increasingly illiquid and volatility dropped to historically low levels. In conjunction with this, there was a refinement in BMO's approach to estimating the market value of this portfolio.
>
> Bill Downe, President and Chief Executive Officer of BMO Financial Group, said: "The commodity trading losses were the result of decisions that did not adequately recognize the vulnerability of the portfolio to changes in market volatility. We are conducting a thorough review and actions have been taken to address the current situation and reduce the likelihood of a recurrence. The commodity trading losses are particularly disappointing as our company continues to experience good operating momentum. We remain committed to providing the high level of service that our clients in the energy sector have come to expect from BMO Capital Markets."
>
> BMO will continue to reposition this portfolio to a lower and sustainable level, consistent with maintaining its core business of serving its energy client franchise. Going forward, the value of this portfolio will be subject to market conditions.
>
> It is possible that as this portfolio is repositioned it could experience subsequent gains or losses depending on future market conditions. However, BMO's

expectation is that, even using adverse assumptions, any losses would be in a substantially lower range than those announced today.

BMO also said that its Tier 1 capital ratio at the end of the first quarter was 9.90 percent and the impact of these losses will be less than 20 basis points on that ratio. As a result this loss does not impair the ability of the company to pursue its strategic agenda.

44. Upon this news, on April 27, 2007, shares of the Company's stock fell $1.45 per share, or almost 21%, to close at $5.56 per share after investors recognized that BMO accounted for 24% of the Company's revenues in 2006.

45. On April 30, 2007, in an article entitled Optionable's BMO Bite, TheStreet.com reported:

> BMO Financials (BMO: NYSE) natural gas blowup could yet singe commodities broker Optionable (OPBL: NYSE).
>
> BMO, also known as Bank of Montreal, admitted Friday that it lost more than $300 million on natural gas trades that went bad.
>
> Optionable, a Valhalla, N.Y., broker of energy options and derivatives trades to U.S. hedge funds and other financial institutions, said in a recent federal filing that BMO accounted for 24% of net revenue last year.
>
> But that figure could significantly understate the extent of Optionable's dependence on Bank of Montreal, its largest customer, for business.
>
> Optionable is in the business of finding so-called counterparties for energy trades – meaning it matches buyers with sellers. The broker charges a commission to both parties.
>
> A spokesman says counterparty deals represent 75% of Optionable's trading revenue. In such transactions, revenue from any given party represents just half of the company's potential revenues. That's a key point in assessing Optionable's dependence on BMO.
>
> A look at Optionable filings from last year show that net revenue for 2006 was $16 million. Taking Optionable's 24% figure puts revenue from BMO at $3.8 million. That figure, in turn, represents 43% of the firm's $8.9 million in 2006 brokerage fees, according to filings with the Securities and Exchange Commission.