But remember, there are two sides to any counterparty deal. So trading deals involving BMO appear to account for 86% of the firm's brokerage fees, even if half of those fees aren't actually from BMO itself.

An external spokesman for Optionable agrees that BMO's impact is likely more than the 24% when factoring in counterparties. He says counterparty trading, in which Optionable gets paid on both sides, represents about three-quarters of its trading revenues. Floor trading makes up the remainder, says the spokesman, declining to provide a further breakdown of Optionable's business with BMO on the floor trades. In floor trades, brokers are only paid once, by the exchange.

Toronto-based BMO, which has been one of the more aggressive energy trading banks of its size, has said that its losses will be recorded on pretax basis in the second quarter of its 2007 fiscal year.

Although BMO chief Bill Downe described the losses as unacceptable, he didn't indicate that BMO would halt its energy trading operation, which has been a lucrative one before its blowup.

Nonetheless, if BMO finds it necessary to pull back significantly, Optionable could face a need to diversify.

46.     On May 1, 2007, Optionable issued a press release announcing its financial results for the first quarter of 2007, the period ended March 31, 2007. For the quarter, the Company reported revenues of $9.1 million, and net income of $3.1 million, or $0.06 per diluted share. Defendant Kevin Cassidy, commenting on the results, stated, in pertinent part, as follows:

> We continue to add to and diversify our products line to meet the needs of our clients by offering an increased variety of energy contracts. We are particularly proud to be the first company to offer NYMEX Light Sweet Crude Oil options through an electronic platform. Crude oil is the world's most actively traded commodity, and the NYMEX Division light, sweet crude oil futures contract is the world's most liquid forum for crude oil trading, as well as the world's largest-volume futures contract trading on a physical commodity.

With regard to the Company's acquisition of HQ Trading, Defendant Cassidy commented as follows:

> This was a very important acquisition for the Company. The HQ Trading team is extremely well-respected in the industry and is a good fit within Optionable. It broadens our client base as well as providing us a critical mass entry in the crude oil options market.

With regard to the NYMEX transaction, Defendant Cassidy commented as follows:

> This is a major strategic step for the Company. NYMEX is the world's largest exchange for the trading of energy futures and options contracts. Our relationship with NYMEX will be an important step in the continued growth of Optionable. It furthers our credibility in the marketplace, expands our client base, and provides us with outstanding marketing and technical resources.

47.  Following the earnings announcement, defendants conducted a conference call with investors and analysts. With regard to the recent reports of BMO's trading losses and Optionable's relationship with BMO, Defendants attempted to minimize its dependence on BMO, stating, in pertinent part, as follows:

> DAVID CHAMBERLAIN, ANALYST, OPPENHEIMER CAPITAL: Hi, guys. Quick question. Can you give us any sense, you know, obviously you've [put it out in the K] in terms of your exposure to the largest client, BMO. Can you give us a sense, in terms of the exposure, in terms of the first quarter from BMO, in terms of their revenue?
>
> MARC-ANDRE BOISSEAU: Well, they accounted for 30% of our revenues.
>
> DAVID CHAMBERLAIN: And is it fair to say that, the right way to look at this from your vantage point that it's more than that, the exposure's more than that because of the counter party risk? Or is that the wrong way to think about it?
>
> ALBERT HELMIG, CHAIRMAN, OPTIONABLE INC: This is Albert Helmig. There is no counter party, because they're clear transactions.
>
> DAVID CHAMBERLAIN: I'm sorry, not counter party risks, but in terms of overall transactions, they are -- because you, two-thirds or three-quarters of your trades are done on a counter party basis, I'm in the understanding that that, the overall exposure to transactions that are related with BMO is higher than 30%. Is that fair to say?
>
> KEVIN CASSIDY: *You really can't make a statement that way, because not all of those transactions are brokered by counter party.*

*   *   *

> LEONARD GROSS, ANALYST, G2 CAPITAL: Hi, thank you. Can you say on an absolute basis, on a dollar basis, how much of your roughly 30% in growth is attributed to the BMO?

MARC-ANDRE BOISSEAU: With the [lead] it was around 2.7 million for Q1.

LEONARD GROSS: 2.7 million.

MARC-ANDRE BOISSEAU: Correct.

LEONARD GROSS: You're -- on the net income side?

MARC-ANDRE BOISSEAU: Pardon me?

LEONARD GROSS: Is that on the net income side? Your income grew from roughly like 6 to 9 million.

MARC-ANDRE BOISSEAU: No, no. This would be from a gross revenue.

LEONARD GROSS: I see. And, okay. And on a quarter-over-quarter basis, on a sequential basis, and there is, if you took the earnings start of the first quarter and went to the second, third and fourth, was the pattern on absolute basis increasing, staying level or decreasing?

MARC-ANDRE BOISSEAU: I'm not sure I understand the question. I'm sorry. You're breaking up.

LEONARD GROSS: I wanted to know if, on an absolute basis, as you look at the quarters, quarter-over-quarter, for the four quarters during the course of the year, was your share of revenues as a percent of absolute revenues with BMO, was it increasing, decreasing or staying the same?

MARC-ANDRE BOISSEAU: In dollars it was increasing. That is, historically. I'm not sure I answered your question, though.

LEONARD GROSS: Well, what I'm trying to figure out is how much of your growth is attributed to BMO. Your growth numbers are extraordinary, they're outstanding. But I'm trying to figure out how much of that growth is attributable to BMO.

MARC-ANDRE BOISSEAU: I think we have to be careful when we analyze. Just forget about BMO, but any given client in our industry. What happens is that, when two market participants enter into a trade, it doesn't mean that because one of them would not make the trade that there's not another one that would enter into it or that would enter into a similar trade. *So, whether it's BMO or any other client that we have, it doesn't necessarily mean that because it's BMO or a third client that makes that trade, that we wouldn't be able to make another one with a different client. Now, I can't tell you that those would be, that we can replace any given client for a hundred percent of the*

19

*trade. But there is enough market participants to enter into a trade to accommodate them.*

LEONARD GROSS: So, do you feel that, based upon that, you'll be able to, if BMO shut down their entire operation, you'd be able to replace the majority, you would be able to capture the majority of the revenue you lost through other trading partners, other firms?

KEVIN CASSIDY: Well, we hope to do that and we are getting an increasing share in crude oil options, but obviously we can't guarantee that. At this point, they haven't said that they're shutting it down and they continue to do business.

LEONARD GROSS: Right. So, if BMO today ceased to exist, do you think you would still, you would be able to capture at least more than half?

MARC-ANDRE BOISSEAU: First of all, I think this is a hypothetical question. *I don't think that BMO is going away. They certainly didn't indicate that they're going away. They're a solid company. They have a strong financial position.*

KEVIN CASSIDY: Let's put this in historical perspective. We've had a successful instances in the past and not so successful. The first one that comes to mind is Enron. In the case of Enron, there, it was systemic. There was no more counter party credit in the over-the-counter market. And consequently, the over-the-counter market came to a standstill. The second one that comes to mind is Amaranth. In that case, it was not systemic and what happened is there was a facility where you could clear over-the-counter trades in the NYMEX clear port and there was a little stall, but like things picked up gang busters. So, it's a matter of where we are in the maturation of this marketplace. We've moved away from Enron. We're in a -- so this probably will be something that we'll move passed and the market will continue to mature.

ED O'CONNOR: I think another perspective around that is that natural gas is slightly different than crude oil and products in that natural gas has an enormous amount of cleared product within the transaction space. *So, the one party or client, if you will, being, withdrawing a certain amount of its participation, because there's no counter party credit risk within the systemic exchange, their space is typically filled by another party almost immediately.* I think the Amaranth example of that is, the Amaranth example speaks to that. That the closing of Amaranth really did not decrease trading volume in that natural gas. It was just assumed by another counter party.

*   *   *

ALEXANDER FLEISS: Okay. Second question, in a New York Post on Saturday, I hate to bring this up, but they mentioned BMO not using you guys

20

for unwinding their positions. I listened to the BMO conference call and they made it very clear that they will continue with their natural gas trading operations. It's a major money maker for them and a huge part of their business. But do you see any signs that they would not be using you in the future?

KEVIN CASSIDY: *No, absolutely not.*

\*    \*    \*

ASHLEY KENNEDY: And sort of not to belabor the BMO issue, but I just want to try to understand it a little more. So, as far as you know, obviously, they're still doing business with you. They're still in the market. They've said that they're not closing out business or anything like that. So, do you have a sense of what they, just from your color and your contacts, what they may be doing with their operations? Would that be taking more risk off their books? Or would that be doing less transactions? And then, on the side of that, sort of, I think you touched on it before, would you expect, just as you said, somebody else to come in and fill their role in the market?

KEVIN CASSIDY: Well, traditionally our largest client, if you went back ten years to even the forerunner of Optionable, you would see that there has been, it's a moving front runner client. There's always a bigger client, especially if they happen to be a market maker in the natural gas options market. So, there's several big clients that we have that are bigger than anybody else because they happen to be in the role of a market maker. And so, around that I wouldn't want to make any other comments than what we made about BMO, except – they made their comments. *They said that they were going to stay in the business. I do believe them. I believe the same people are still there, but probably they have more, you know, supervisory around risk at this point, which is very understandable.* The natural gas market is a very volatile market and it has volatility and volume vacuums. So, you could easily have it be extremely volatile where people are short options are getting their eyes ripped out or you can have just no volatility, it sits and you have a volume vacuum and a volatility vacuum at the same time, which if you're a long ball player is painful.

ASHLEY KENNEDY: Right. So, but if you expect, if these guys say they may take their risk profile down, but they obviously are they're making markets or doing what they're doing for their clients. So, if they're not going to take on that, would they expect, would someone else fill that position?

KEVIN CASSIDY: Yes. Absolutely. And less risk doesn't necessarily mean less trading. But, just in general, any time in the past that there's been a market participant that was very big in the market and they left, it's created some expansion of volatility for some period of time in the quarter following. And whether that is the case here or not we don't know. And we wouldn't want to

speculate on that. But there's always been someone who fills the role of a major market participant and market maker.

48.     Optionable's financial results for the first quarter of 2007, the period ended March 31, 2007, were reported in the Company's Report on Form 10-QSB filed with the SEC on or about May 1, 2007, which was signed by defendants Cassidy and Boisseau. With regard to BMO, the annual report stated:

> One of the Company's customers accounted for approximately 30% and 10%, respectively of its revenues during the three-month periods ended March 31, 2007 and 2006, respectively.

49.     On May 2, 2007, the Company issued a press release announcing that Defendant Helmig had been elected Chairman of the Board and Defendant Nordlicht had resigned as Chairman and Director.

50.     On May 8, 2007, BMO issued a press release announcing that it suspended all of its business relationships with Optionable pending the results of a full external review. According to *The Globe and Mail*, "the review comes after the bank surprised investors with the announcement that it expects to record $350-million to $450-million in paper losses this quarter stemming from commodity trades, particularly in natural gas. . . . About one-quarter of Optionable's $16.1-million (U.S.) in revenue last year came straight from BMO. . . . BMO was becoming more and more important to Optionable's bottom line. In 2005, only 18 per cent of Optionable's $5.8-million in revenue came from the bank."

51.     On May 9, 2007, the Company filed its Form 8-K with the SEC. The 8-K stated:

> On May 8, 2007, BMO Financial Group ("BMO") issued a statement indicating that BMO is suspending its business relationships with Optionable, Inc. (the "Company"), as well as all derivatives trading through the Company, pending the results of an ongoing external review of certain commodity trading losses incurred by BMO. BMO has accounted for a significant portion of the Company's revenues. The Company believes that it is likely that BMO's statement and suspension will have an adverse effect on the Company's business,

including its future results of operations and financial condition. The Company is unable to quantify the impact of BMO's statement and suspension at this time.

On May 9, 2007, The New York Mercantile Exchange, Inc., a subsidiary of the NYMEX Holdings, Inc., announced that it will offer options trading for crude oil, natural gas, gold, and silver on the CME Globex electronic trading platform beginning in June 2007. We believe that some of the contracts trading on the CME Globex platform may compete with contracts trading on the Company's OPEX platform. The Company is unable to quantify the impact of this potential competition on its business, including its future results of operations and financial condition.

52. In response to the announcement that BMO had suspended all of its business relationships with Optionable, on May 9, 2007, the price of Optionable stock declined precipitously falling from $4.64 per share to $2.81 per share - a decline of approximately 40% - on heavy trading volume.

53. On May 9, 2007, in response to the news that BMO was suspending all of its business relationships with Optionable, the Company issued a press release. The press release stated that "one of its clients recently incurred some losses that have become a subject of public discussion." In that regard, Defendant Hemig stated:

> Gains and losses are both inevitable in trading energy derivatives. We are never pleased when losses dominate for one of our clients, but we do not design or help to design their strategies, nor are we financial advisors. We provide brokerage and execution services for trades that we are instructed to make by our clients. We believe strongly that our brokerage and execution services are and have been rendered appropriately, professionally and correctly.

54. In response to this announcement, shares of the Company's stock fell $1.97 per share, or approximately 70%, to close at $0.845 per share, on heavy trading volume.

55. On May 14, 2007, NYMEX announced that it resigned its board representation of Optionable pending a review of the brokerage firm.

56. On May 14, 2007, the Company announced that, on May 12, 2007, the Company accepted the resignation of Defendant Cassidy.

57. Upon these announcements, shares of the Company's stock continued to fall, closing at $0.425 per share, a decline of $0.585 per share or approximately 60%.

58. On May 16, 2007, in an article entitled "NYMEX pulls director from Optionable; Wasn't told ex-CEO had criminal record," The Gazette reported that NYMEX removed its representative from Optionable's board of directors after learning that Defendant Cassidy served time in prison. According to the article, Defendant Cassidy was sentenced to 30 months for a felony conviction on credit card fraud in 1997 and six months for income tax evasion in 1993.

59. On May 18, 2007, in an article entitled "BMO raises trading loss to $680 million; Probing 'potential irregularities.' Says it has increased concerns with reliability of quotes from principal broker," The Gazette reported that BMO engaged forensic auditors Deloitte & Touche LLP ("Deloitte") in February to investigate its natural-gas trading portfolio. In a report to BMO in mid-April, Deloitte questioned the valuations provided by BMO's broker, Optionable. Moreover, the article reported that BMO had increased concerns with the reliability of quotes received from Optionable.

60. The markets for Optionable's securities were open, well-developed, and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Optionable's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Optionable's securities relying upon the integrity of the market price of Optionable's securities and market information relating to Optionable, and have been damaged thereby.

61. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Optionable's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as

set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

62.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Optionable's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Optionable and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## Additional Scienter Allegations

63.   As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Optionable, their control over, and/or receipt and/or modification of Optionable's allegedly materially misleading misstatements and/or

25

their associations with the Company which made them privy to confidential proprietary information concerning Optionable, participated in the fraudulent scheme alleged herein.

64. Defendants were further motivated to engage in this course of conduct in order to allow Defendants Cassidy, O'Connor, and Nordlicht to sell 10,758,886 shares of their personally-held Optionable stock for gross proceeds in excess of $28 million.

## LOSS CAUSATION/ECONOMIC LOSS

65. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Optionable's securities and operated as a fraud or deceit on Class Period purchasers of Optionable's securities by failing to disclose to investors that the Company significantly understated its reliance on its relationship with BMO and that the Company's CEO was sentenced to 30 months for a felony conviction on credit card fraud in 1997 and six months for income tax evasion in 1993, among other things. When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Optionable's securities fell precipitously as the prior artificial inflation came out. As a result of their purchases of Optionable's securities during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

66. By failing to disclose to investors that the Company significantly understated its reliance on its relationship with BMO and that the Company's CEO was sentenced to 30 months for a felony conviction on credit card fraud in 1997 and six months for income tax evasion in 1993, among other things, defendants presented a misleading picture of Optionable's business and prospects. Thus, instead of truthfully disclosing during the Class Period the true risks that Optionable was exposed to, defendants caused Optionable to conceal the truth.

67. Defendants' false and misleading statements had the intended effect and caused Optionable's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $8.6225 per share on February 13, 2007.

68. As a direct result of defendants' disclosures on April 27, 2007, May 9, 2007, and May 14, 2007, Optionable's common stock price fell precipitously. These drops removed the inflation from the price of Optionable's securities, causing real economic loss to investors who had purchased the Company's securities during the Class Period.

69. The more than 90% decline in the price of Optionable's common stock after these disclosures came to light was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Optionable's common stock price decline negates any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Optionable's securities and the subsequent significant decline in the value of Optionable's securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance: **Fraud on the Market Doctrine**

70. At all relevant times, the market for Optionable's securities was an efficient market for the following reasons, among others:

(a) Optionable's stock met the requirements for listing, and was listed and actively traded on the OTCBB, a highly efficient and automated market;

27

(b) as a regulated issuer, Optionable filed periodic public reports with the SEC and the OTCBB;

(c) Optionable regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Optionable was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

71. As a result of the foregoing, the markets for Optionable's securities promptly digested current information regarding Optionable from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of Optionable's securities during the Class Period suffered similar injury through their purchase of Optionable's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

72. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Optionable who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

73.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.  During the Class Period, defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Optionable's business, operations, and management and the intrinsic value of Optionable's securities; (ii) enable Defendants Cassidy, O'Connor, and Nordlicht to sell 10,758,886 shares of their personally-held Optionable stock for gross proceeds in excess of $28 million; and (iii) cause plaintiff and members of the Class to purchase Optionable's publicly traded securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, defendants, and each of them, took the actions set forth herein.

75.  Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Optionable's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

76.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Optionable as specified herein.

77.     These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Optionable's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Optionable and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Optionable's securities during the Class Period.

78.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and

participated in the creation, development, and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

79. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Optionable's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations, and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

80. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Optionable's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of Optionable's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the

market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Optionable's securities during the Class Period at artificially high prices and were damaged thereby.

81.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding Optionable's financial results, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired Optionable's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

82.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

83.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

84.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

85.    The Individual Defendants acted as controlling persons of Optionable within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

87. As set forth above, Optionable and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.  Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.  Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 22, 2007                COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.


*Catherine Torell* (signature)

Catherine A. Torell (CT-0905)
150 East 52nd Street
Thirtieth Floor
New York, New York  10022
Telephone:    (212) 838-7797
Facsimile:    (212) 838-7745

Steven J. Toll
S. Douglas Bunch
1100 New York Avenue, NW
Suite 500, West Tower
Washington, D.C.  20005
Telephone:    (202) 408-4600
Facsimile:    (202) 408-4699

*Attorneys for Plaintiff*

35